and Secretary of the Alabama Law Enforcement Agency, Tony Bourdain on the 7-381-4233. The first case is Michael A. McGuire, J.E.B.K.L.L. v. Attorney General of the State of Alabama and Secretary of the Alabama Law Enforcement Agency, Tony Bourdain on the 7-381-4233.  I'll give you all a chance to get set up. Mr. Smith, when you are ready, you may proceed. I see that you have reserved a little bit of time for rebuttal. Thank you, Your Honor, and good morning. May it please the Court, my name is Bryn Smith and I represent Attorney General Steve Marshall and Alabama Law Enforcement Agency Secretary Hal Taylor. The First Amendment does not entitle sex offenders to live with or near unrelated minors, nor does it entitle sex offenders to spend the night with minors outside their own nuclear families. And because First Amendment scrutiny does not even apply to such restrictions, plaintiffs' facial First Amendment claims challenging Alabama's residency provision fail at step one. At any rate, plaintiffs face a steep burden in seeking to prevent all enforcement of the residency provision against all sex offenders. Which requires them to show that the unconstitutional applications substantially outweigh the constitutional ones. But to do so, they rely on a tortured interpretation of Alabama's law that the State itself rejects. As this Court did at the stay stage, it should again reject plaintiffs' attempts to rewrite and thereby dismantle Alabama's residency provision. Starting with step one, the First Amendment does not apply to this case and this Court's holding and right v. City of St. Petersburg is dispositive. In that case, this Court held that First Amendment scrutiny has no relevance to laws directed at imposing sanctions on nonexpressive activity. And here, there is no dispute that the residency provision is such a law. It does not directly regulate expression. The injuries, the burdens that plaintiffs complain about are downstream effects from its regulation of nonexpressive conduct, residential conduct in particular. Indeed, plaintiffs have conceded that it doesn't regulate expression in two different sections of the brief, both in this section and in discussing which intermediate scrutiny test applies. Nor do they discuss the right case anywhere in their brief. This issue is straightforward. The collateral burdens just do not trigger a First Amendment review. This is also derived from Arcara v. Cloud Books, which distinguishes cases where speech or expressive conduct might be singled out as necessary from the statute, but that simply isn't the case that we have here. Can you start with what is the correct legal standard? I don't know if it's as straightforward as either party proposes. So what is it that you believe, how should we be evaluating this law? Well, I think it's step one, Your Honor. It starts with does the First Amendment even apply? And I think Wright and Arcara answer no. The First Amendment doesn't apply to this kind of law that is regulating nonexpressive conduct. If these sorts of nonexpressive regulating statutes or restrictions were subject to First Amendment scrutiny, then courts would be doing intermediate scrutiny analysis in every criminal sentencing and every damages award to determine if a prison sentence restricted First Amendment rights too long. So a law like this should never be subject to an overbreath analysis to make sure, indeed, it is not covering otherwise expressive conduct? That's right, Your Honor. It's a downstream effect. And so both in Arcara and the Supreme Court affirmed there that a civil nuisance suit that resulted in closing a bookstore whose premises were used for prostitution, and in Wright where Wright involved a gentleman, a pastor, who had been trespassed from a park as a result of resisting arrest in the park. And then a year later, he went to the park and he wanted to engage in religious expression. And this court rejected his First Amendment claim saying you were trespassed from the park as a result of your arrest, which did not involve any expressive conduct. While that may have some downstream consequence on your ability to engage in that expression now, that does not trigger First Amendment review. So since this case was briefed, Arcara was decided, Henry, which was another challenge to this same statute, do you see that, and it was decided under the 14th Amendment and we're proceeding under a First Amendment challenge here, but do you see, does Henry in any way affect your position positively, negatively, not at all? I don't think it has any effect, Your Honor. If anything, it just shows that there are other relief valves for the sort of things that Judge Abudu is raising, that the First Amendment doesn't have to be a panacea for every type of burden that someone might face because there was a 14th Amendment challenge. But other than that, no, I don't think it affects the outcome in this case. Plaintiffs raised a couple of examples to attempt to distinguish this case from Wright or Arcara. Particularly, they point to Packingham, but I think it's important to note there that Packingham was a categorical bar on any access of social media websites, which is a particular public forum. Here, under any interpretation of the statute, plaintiffs can go engage in any public forum they want. They can go to church. They can protest in parks. No public forum is wholly off limits to them, even under their less good reading of the statute. The same with Roman Catholic Diocese. Their COVID restrictions in New York singled out houses of worship. There was some singling out as opposed to just downstream effect. In Gadens v. Wardensky, it was a First Amendment retaliation claim based on a family member's speech. Again, Wright is dispositive on this case. This Court need proceed no further, but if it does, I think discussing the statutory text itself is important. Here, unless this Court considers plaintiff's reading to be the clear and uncontestable reading of the law, some statutory construction is required. But there is significant textual evidence that pulls against plaintiffs' strict constructionist interpretation of the statute. The superfluity that would emerge if the totality of the circumstances, the common sense line built into the second sentence of the test, were overridden by the chronological blinders that they attempt to impose by elevating the third sentence in the standard. Plaintiff's reading totally undoes the totality of the circumstances test. They say, well, sometimes the totality of the circumstance test can be met by one standard. Well, that's true, but here their test doesn't just allow it to be met by one particular circumstance. It prevents, it precludes any consideration of any other circumstance, which is not how totality of the circumstances tests are done. And so by using includes in the third sentence to override the mandatory shall language in the second sentence, which at the end of that sentence particularly says it includes both the time spent at the place and the nature of the conduct, plaintiffs totally read out that and the nature of the conduct. So you're saying now, just to be clear, that these individuals can go to church without any concerns? That's right, Your Honor. Even though there are children there? That's right, Your Honor. As long as they're not residing at the church. I mean, if they were sleeping at the church, if they lived at the church. Well, the definition of reside, as I remember it, doesn't necessarily include sleeping someplace. It seems like just a matter of how long you're there, where you are, those kinds of things. So I just want to say, I mean, if you are stating on the behalf of the state of Alabama that these individuals can worship without fear of prosecution, is that you're saying that ends their case? I am stating that, Your Honor, yes. That is the case. That is the proper reading of the statute. This does not prevent anyone from going to worship services. Okay, so to just drill down, there seem to be two, at least five items that have stuck in my mind, whether it's from the plaintiff's briefing or the district court or both. So the first one, going to the church example, some of the plaintiffs have expressed a concern, looking at the time limit, that if they attend church for more than four hours a day, for more than three days, that they're running afoul of the reside provision. What is your specific response to that concern? That they are not running afoul of the resident supervision, Your Honor, because you have to consider the nature of the conduct at the place, whether it's some sort of residential conduct. If they're going for normal worship services, if it's a revival, if they're participating in some sort of ministry, that's not a type of residential conduct that the totality of the circumstances builds in. And so looking just at the time ignores that in the second sentence of the statute, which commands, I'll just quote it, whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place. So ordinary conduct in worship, worship, singing, whatever it may be at a revival, that does not establish a residence at that place. Plaintiffs engaged in that kind of conduct are free to attend worship services. In response to my question, you're focusing on the fact that we're looking at whether someone resides. We can't ignore that that word is there. That's right. And we also can't focus on time exclusively. We have to look at their conduct, which, again, you look at the totality of the circumstances and determine what it means when someone resides. That's absolutely right, Your Honor. The plain meaning of the word reside informs this definition that the nature of the conduct at the place is some sort of residential conduct. And that's why I didn't bring up sleeping because sleeping triggers it, but that's the kind of thing, if you're sleeping at a place, that may indicate that you live there. Or if you spend— Did the legislature specifically amend the statute to remove sleeps from the statute? It did, Your Honor. I think— Does that indicate that the legislature intended to broaden it beyond— I mean, they clearly wanted to go beyond the federal SORNA, which has been found constitutional. Everybody by now kind of knows what that means. And even their previous version of SORNA had been— I mean, it seemed pretty clear, based on case law and so forth, what activity was prohibited. But when they amended it, they specifically intended to broaden the statute by removing the type of language that you're now saying that we should read into the new version. I would push back on that last part, Your Honor. I don't think I'm asking you to read anything in. I think removing the word sleeps is trying to get around someone who is trying to be technical and say, well, I get mail at this place, I sleep at this place, but they're spending 16 hours a day at some different residence. I think it just allows you to get around sort of those circumstances and provide some common sense. I don't understand that example. Can you break that down again? So I think it's getting at, you know, a sex offender could have a mailing address at a particular residence that's in a compliance zone. And perhaps they really would like to live somewhere else, and so maybe they sleep. Maybe they sleep at this particular house, but they're spending the rest of their waking hours at a totally different location. I think this language gets around that. Are you really living at that house? Are you cooking? Are you gardening? Are you doing everything else that looks like residential activity except sleeping? Well, previously sleeping wasn't a requirement to be residence, right? It says, I think it was reside, sleep, habitually live. So still the same other sort of language that you could point to, even if the person isn't sleeping there, if they're habitually living there and so forth. I'm just taking issue with your, when the Alabama legislature specifically removed that one, you're using sleeping as a reason for us to say, oh, well, clearly that wouldn't include charge. I'm not trying to imply that sleeping is any sort of bright line rule, Your Honor. It's just one factor that someone might consider in a totality of the circumstances analysis. And so, right, that's the kind of thing that you might consider. You may have other things pulling the other way. It's just one example. Typically where someone lives is where they sleep. That may not always be the case, and this sort of totality of the circumstances test provides flexibility to consider that. So I said there are two examples that the plaintiffs in the district court have talked about, and I want to get you to respond to the second one. The second one would be dealing with the overnight visit, which says no adult sex offender shall reside or conduct an overnight visit with a minor. And then overnight visit is more simply defined, any presence between the hours of 10.30 p.m. and 6.00 a.m. So the argument goes, that's being raised by the other side, that suppose somebody is working on a night shift at a gas station, which is necessarily going to fall between these hours of 10.30 p.m. and 6.00 a.m., and a child enters the premises for five minutes. Is this transformed into an overnight visit with a child? No, Your Honor, because it's very important in the text of 1520A11 itself. It's conducting an overnight visit, and there's a knowingly mens rea there. If there's something more than just physical presence, you have to knowingly be conducting a visit with them. So pumping gas next to them or going into a restaurant, passing in a grocery store, that sort of fleeting conduct, no one would describe that as conducting a visit or even conducting presence with that person. So no, it would not reach that example. No, I mean, the state of Alabama attorneys wouldn't prosecute someone for that behavior. That's right, Your Honor, and I would like to point out to that point, plaintiffs have put in the record data on prosecutions in Alabama, and they have not pointed to a single prosecution that adopts either of the interpretations that they're advancing here today. And so given the 16,000 approximately sex offenders that live in Alabama, all of whom live somewhere, they reside, they have a house or an apartment, out of all of those, they've pointed to no prosecutions for that, and we have at most three examples of the three plaintiffs themselves. If you credit their testimony and the hearsay evidence they've proffered, those examples simply don't outweigh the constitutional. We have a pre-enforcement challenge, and then the district court entered an injunction that our court stayed except as to the plaintiffs. So I wouldn't expect there to be any incident involving the plaintiffs, right? Well, the stay was more specific than that. It was only as to one particular sub-provision. It was only as to D-4, which involves living with children in particular, which was at issue in Henry. But even the time period that they looked at, which I think was a five-year period. Was D-4 mentioned in this case? No. No, Your Honor. D-4, as far as I'm aware, does not apply to plaintiffs themselves, as none of them live with their own children. So why do you know when D-4 was mentioned? I do not, Your Honor, other than just the Henry case was pending simultaneously. But given that test, the over-breath test, the constitutional applications, for plaintiffs to prevail, they have to show the unconstitutional applications substantially outweigh the constitutional ones. And given those 16,000 people who live somewhere, weighing that against the at most three examples that plaintiffs have proffered, they have not carried their burden under either the over-breath claim or the intermediate scrutiny claim, which they have not pleaded. Is there a delineation of the totality of circumstances that the State considers? Is that anywhere in the statute? Or how is that determined or categorized? Well, Your Honor, if you look at the statute itself, it provides two circumstances that should be considered, the amount of time and the nature of the conduct. I would add there's also a handbook. The Office of Prosecution Services has a sex offender resource prosecutor that law enforcement call and consult on such things. And there's testimony in the record that law enforcement do consult with either that office or with the district attorneys before enforcing such statutes and testify. Every law enforcement officer to testify in this case disavowed that they would enforce the statute in the way that plaintiffs are proffering, at least without consulting an attorney first. Thank you. And I know we took you over, but you still have two minutes. Who knows, we may take you over, Mr. Lamb, as well. Thank you, Your Honor. But thank you, Mr. Lamb. You may proceed. Good morning, Judge Branch. And may it please the Court. Kevin Lamb for Plaintiffs Appellees. I want to start with what the State did not argue. The State did not argue that it would be constitutional to apply Sections 11a and 11d to prevent plaintiffs in this case from attending political rallies or participating in their faith communities and families. That alone, that failure to make any contrary showing, either in this Court or in the district court, that the State has effectively conceded that such applications of the statute to prevent plaintiffs' intended First Amendment activities would burden substantially more speech than is necessary to achieve the State's legitimate aims. That is enough to infirm the adjunction that the district court entered here, which was limited to preventing the statute's enforcement against the plaintiffs in this case. Now, a lot of what I think the State focused on was whether this statute even implicates the First Amendment and then the overbreadth ruling of the district court. The State, if they're over here telling us the First Amendment doesn't even apply, and even if it does apply, it doesn't fail any sort of constitutional test. But at the end of the day, this is not what we're doing. We're not enforcing it in that way. I don't know that I see that as a concession that the injunction should be affirmed. So in the narrow tailoring part, they certainly did not make any showing that the construction of the statute that we have argued for, that this Court articulated twice in both Henry and in the Maguire decision in 2022, and that the State appellate authority, REH, that we cited to this Court also has adopted the plain text reading of the statute. That statute, if that statutory construction applies, that certainly burdens more speech than is necessary to achieve the State's legitimate aim, and they didn't put on a contrary showing. Well, the State is standing before us telling us that the First — they do not believe the First Amendment applies, and they are citing a Supreme Court case and our case. They're citing ACARA. They're citing Wright. It stands, and ACARA's language says, while every civil and criminal remedy imposes some conceivable burden on First Amendment-protected activity, a First Amendment claim will not lie unless in a particular enforcement action targets expression or if the statute's text has the inevitable effect of singling out those engaged in expressive activity. How do you get around Wright and ACARA? So Wright and ACARA about sanctions, Judge Branch, those are really not about the kind of application of a statute like here that prevent plaintiffs from engaging in family gatherings, from attending church, and from attending political rallies. There's no question that those activities are expressive activities and that the statute, if properly read for its plain text, would reach them. So that implicates the First Amendment. That's no different from the Packingham case, from the Doe case we cited, and the Hodgkins case. It targeted expressly the First Amendment. It targeted social media activity. Here, the statute is saying you don't want sex offenders spending time around minors, living with them, or conducting overnight visits. Those are very different statutes or provisions or sentences. So let me answer on Packingham, and then I do want to also get to Doe and Hodgkins, two cases that we cited to this Court and that the State never addresses, the District Court relied on. In Packingham, it is true that the statute at issue was directed at social media sites. The decision by the Court articulated the fundamental principle there, which is that individuals must have access to First Amendment forms and activities, and it was on that basis that the Court proceeded then to apply an intermediate scrutiny standard to evaluate the law. That's no different from here, where also the access of these individuals to First Amendment forms and activities is impeded by the broad scope of the residency provision and this overnight provision, Section 11d. Those are similar. So Section 11d, let me just start there. Section 11d is, as the District Court rightly recognized, the equivalent of a curfew. Hodgkins addressed a juvenile curfew, and the Seventh Amendment said there, articulating principles that apply equally here, that prevents juveniles from engaging in all kinds of protected First Amendment activities and First Amendment forms, including death penalty protests, candlelight vigils, late-night religious worship, late-night legislative sessions. All of that is substantially overbroad, and therefore, it also rejected the threshold argument that the City of Indianapolis made there, that Arcara precludes the case. Well, that's no different from here. The State made that argument in Hodgkins, and the Seventh Circuit said that's not right. Obviously, preventing people from being out in public is a precursor to them engaging in First Amendment activities. So, too, here, the broad scope of 11a and 11d precludes registrants from being out in public, which is a necessary precursor to engaging in First Amendment activities. It's not like Arcara or Wright's reasoning. In both of those cases, the court reasoning, which I think Justice O'Connor really captured in her concurrence, is you cannot say the First Amendment is implicated just because you arrest a newscaster for a traffic violation. So, too, in Arcara, it does not implicate the First Amendment to close down a bookstore for conducting prostitution out of that bookstore. That is non-expressive conduct that a sanction was imposed on. So, too, with Wright, it does not implicate the First Amendment to bar a minister from being present at a location where he obstructed a police investigation. None of that is similar to applying a section 11a and a section 11d to, in the first instance, prevent these registrants from being present in public to attend First Amendment activities and to engage in those First Amendment activities. You have stated on record that they don't plan to prosecute anyone for going to church, they haven't prosecuted anyone for going to church, and that your client should not fear such prosecution. Why should we not rely on that for purposes of saying the interpretation is the same on both sides? If I can directly address that, three points. First, the State stood here before this Court in 2022, having filed a supplemental brief in 2017 directly after those legislative amendments, and said, look, the time gives you concrete examples of what the statute means here. And the statute means that if you're at a jogging park or you're at a baseball game, you can, in fact, be prosecuted for spending times in excess of the aggregate time limit. Those are, in fact, the words of the State back then. I don't think we should disregard that the State has essentially flip-flopped, and the terms of the statute say what they say. Under this — so the second point, really, under this Court's precedent, which, you know, the H.M. Florida decision reaffirmed, the speech right, the speech first case that we cite in our brief has the same standard. Really, the credible threat of enforcement comes down to whether there is an objective chill. These individuals here are not self-centering — self-censoring from what they wish to engage in out of, you know, some subjective abundance of caution. The statute says what it says. It was clearly amended in 2017 to be broader than it had previously been by getting rid of the words sleeping and living that had previously been there, and now captures them spending the aggregate time limits. So that self-censorship is consistent with the plain text, and that credible threat of enforcement comes directly from the objective chill of those statutory words. So why do you have the State's argument that when you point simply to the aggregate time limit, you are reading out of the provision other very important words, such as residing shall be determined by the totality of the circumstances, including the amount of time, to your point, the person spends at the place, and the nature of the person's conduct at the place. And then you're then focusing on the next sentence. The term resides includes, but is not limited to, and then it talks about different time frames, and you're saying that that's all we look at. We're not looking at that we're defining the word reside. We're not looking at totality of the circumstances, and we're not looking at the conduct to determine whether this is residing. So we're looking at all of that, and it's all consistent. So let me start with just the first sentence of that statutory definition, which is even broader. It says simply to be habitually or systematically present at a place. That's what it means to be resides. And, of course, when the statute defines a term, that definition overrides the ordinary meaning. They haven't cited you to a case that says otherwise. So that's where we start. And then, of course, the second sentence says that is determined by the totality of the circumstances, but it never defines what the nature of the conduct at. It doesn't give you anything that would tell you or that would direct law enforcement how to understand nature of conduct. The sentence that comes next, the one that we've been focused on, says reside includes, but is not limited to. That plain text means what follows satisfies the definition of resides. And even if that were not enough, I really want to underscore the third example that comes in that list. So the first example is four or more hours, three or more days in a row. The second is four or more hours, ten days total, and a calendar month. The third is to spend any amount of time at a place with actions or conduct that indicate an intent to live there, or merely to spend the amount of times specified in this sentence. That suggests the State, the legislature meant what it said here, that if an individual were present, for example, at a Black Lives Matter rally with the intent to be there three days in a row all day, that person would have established a residence under the plain terms of this statute. Aren't you running straight into the logic that the Supreme Court rejected in Chicksaw Nation and saying that the language of this opinion that you're running headlong into is that one would have to read the word including to mean what it does not mean. That the way that Chicksaw Nation was trying to interpret the tax provision and that, would serious, you can't give that independent meaning, independent operative effect without seriously rewriting the language of the rest of the statute. The presence of a bad example in a statute does not warrant rewriting the remainder of the statute's language. So I will answer the Chickasaw, but if I can for just one second, Judge Branch, I want to underscore something that I don't want to get lost, which is we're talking about real-world arrests that confirm that the State is in fact arresting people based solely on the time and based solely on overnight presence, even in locations that are outside of private residence. And so the record does contain that evidence at documents 130-14 through 130-18. And what it shows is that, for example, people are being arrested because they had spent merely in excess of the times that the aggregate time limit sets at, for example, a relative's house, even though they weren't necessarily, it doesn't mention in the arrest records that they were living there or sleeping there or anything else. So to document 130-18 shows that there was an arrest for someone spending any amount of time, and in fact in that case it was between 10 and 6, that's not even a crime, but in a car, in a vehicle with an unrelated minor. So, again, you really do have evidence in the summary judgment record which the State is simply ignoring while standing up here and saying, hey, there's other stuff that has to be involved. To the point about Chickasaw, Chickasaw gave a very limited application, what I would describe as the absurdity canon, by saying there was a bad example on a statutory list. The parenthetical there was in the context of a statute that said reporting or withholding of taxes. That was the overarching category, and the examples had to fall into that. All of them did, but one did not. In that instance, what the Supreme Court said is the bad example, the reference to Title 35, doesn't make any sense, and so we're just going to read that out of the statute. You can't read includes but is not limited out of the statute here without effectively running afoul of, you know, I think separation of powers principles. The legislature was clear about its intent. It wanted to speak broadly here, and it decided to, by getting rid of a narrow definition that it had, by reference to living and sleeping and so forth, and by creating this definition that is much broader and instead relies on this aggregate time limit. And so if I can, I'd like to turn to kind of what I think are two key cases that other circuits have sort of addressed these fact patterns. That's, again, the Hodgkin's case that we cited where the Seventh — the Seventh Circuit really addressed a curfew law that I think is very similar to the circumstances you have here, because Section 11d, because of the breadth of its definition, effectively prevents registrants from being present at any location for fear of the ever-present possibility. Now, the State stood up and said a gas station wouldn't be implicated because we have the word conduct unknowingly. But that doesn't change the broad definition of conduct an overnight visit. Conduct an overnight visit means to be present when any unrelated minor is present. I would submit that if the State is saying a person being present with an unrelated minor at a gas station, knowing that that person was there and then not leaving, doesn't run afoul of the statute, then they're rewriting the statute. That's the language of the statute. And to include the verb conduct doesn't change that, and they haven't really explained how it does. So the reason for the self-censorship of the registrants here, the reason that, in fact, the Court held below that this statute was unconstitutional as applied to them, is, frankly, in the face of this broad language, people are going to be prevented from engaging in activity that is protected. Can you speak to the scope of the injunction that's on PCASA now? And there's some debate, arguably, about whether or not a statewide injunction is still proper. What is your position? So two points. First, this is an overbreadth case. The statute was passed less than a year before Trump v. CASA was decided. Trump v. CASA doesn't speak to the overbreadth doctrine. We certainly think it does not overrule it sub salientio. So the overbreadth doctrine remains good law and certainly allows district courts to reason that a law is facially invalid based on overbreadth. With respect to statewide injunctions and, you know, whether those are still valid after Trump v. CASA, I think this Court's analysis in the H.M. Florida case is directly on point and is consistent with CASA in certain respects. So what this Court certainly said there is the statewide injunction doesn't pose the same sort of issues of a nationwide injunction because it still allows law to percolate. Once this Court articulates any decision about the proper meaning of Section 11a and 11d, this Court's jurisdiction over Alabama decides that as a matter of binding precedent in the Eleventh Circuit. And certainly lower courts and future panels of this Court will not be able to disregard that. That's consistent with Justice Kavanaugh's concurrence in Trump v. CASA, recognizing that circuit precedent and Supreme Court precedent certainly will have effects beyond a given case and will, therefore, you know, effectively decide issues for States and for the nation. And I think that remains, therefore, true and is the appropriate path here. Now, I would, you know, sort of underscore that the district court was clear, declaratory relief was all that it was doing with respect to the facial overbreadth issue. It didn't enter an injunction that applies to anyone beyond the plaintiffs here. There is no such injunction before this Court. Now, even as that declaratory relief is entirely appropriate, all it is is articulating the reasoning of the Court and is certainly an independent basis for this Court to affirm the decision below for both reasons, both because the law is unconstitutional as applied to the plaintiffs in their intended activities, something that I think the State has largely conceded at this point, and because the statute is fundamentally overbroad, this Court should affirm the district's court ruling. Thank you, Mr. Lamb. And this has been two minutes. Thank you, Your Honor. Picking up where Mr. Lamb left off, for the State to concede plaintiffs' as-applied claims, they would have to have them, and they have not pleaded as-applied First Amendment claims under any doctrine other than the overbreadth doctrine, which does not permit of as-applied claims, as the Supreme Court has been clear many times when talking about we don't need to do overbreadth here as-applied challenges can handle it. Plaintiffs haven't articulated a separate First Amendment claim in their complaint, which is the operative document, and so certainly the defendants have not conceded those claims, nor could plaintiffs prevail on them. It just requires intermediate scrutiny, which is effectively, it has few more teeth than rational basis. As long as there is some evidence or even just rational speculation that the end meets the means, the restriction will withstand intermediate scrutiny under its current articulation, under either the O'Brien articulation or even under the Club Madonna articulation if we go to a time-place matter restriction. I also want to address the assertion that the State is flip-flopping, which relies on cherry-picking quotes from our previous brief. While it does say that these are concrete examples, in the previous sentence it says, the nature of the conduct is considered in this, and it goes on to say that, yes, you consider someone could reside at a baseball stadium. You can imagine a homeless individual who perhaps is sleeping under the bleachers, and when you do the totality of the circumstances test, they would be establishing a residence at a baseball stadium. Reading anything more into the brief takes it further than it really says, and it even goes on to say that under the previous definition, which just used the phrase living accommodation, that someone could establish a living accommodation or a residence at a baseball stadium, no more than that. Lastly, I just briefly touch on... I don't know if that last point was about the prosecution or the State's position, but I guess I'm just trying to understand the distinction between the State's legal interpretation and, therefore, decision not to prosecute, as opposed to a policy decision not to prosecute, because, again, this latter doesn't give the plaintiff the necessary assurance. This is a legal determination, Your Honor. The definition that we're proffering here is not one we're saying we won't enforce it this way because we're worried about it. This is the definition that the State thinks is the definition, and I think if the Court has any further concerns about that definition, certification to the Alabama Supreme Court would be an appropriate relief valve here, adopting a limiting construction or applying the canon of constitutional avoidance. But anyway you get at it, the State's definition of reside includes those totality of the circumstances, the nature of the conduct, and just simply does not reach the examples that plaintiffs proffer. Thank you.